Case No. 19-5147, Friends of Animals Appellants v. David Longly Bernhardt, in his official capacity as Secretary of the Interior et al. Case No. 19-5152, Center for Biological Diversity et al. Appellants v. David Longly Bernhardt, in his official capacity as Secretary of the U.S. Department of the Interior et al. Ms. Sanerib for the Appellants Center for Biological Diversity Mr. Hernick for the Appellants Friends of Animals Ms. Engels for the Federal Appellees Great. We'll hear from Ms. Sanerib first. Thank you and good morning, Your Honor. May it please the Court, Tanya Sanerib, on behalf of Plaintiffs Appellants. Thank you very much for this opportunity to appear by phone. Can everyone hear me okay? Yes. Yes, thank you. Great. In December 2017, this Court held that enhancement findings made for Endangered Species Act trophy imports require notice and comment proceedings under Section 553 of the APA. Finding two import bans to be unlawfully established, this Court left them in place with a remand directing the Service to initiate rulemaking. In direct contravention of that ruling, the Service is trying to avoid rulemaking, and its attempts were flawed. Counsel, I have a question. Excuse me, Counsel, this is Judge Silverman. I have a question at the outset. Why were these cases not merged as one case with one party as the plaintiff and the other party as the intervener? I'm sort of mystified why they were two separate cases. I think, Your Honor, that that's probably a good question for the Department of Justice, since they're a party in both cases. There is absolutely some overlap between the two cases, but there's also quite a good number of distinctions between some of the claims as well. And so it may be that the Department of Justice thought it was better to brief the two cases independently rather than trying to consolidate them in the District Court below. But that's how they came to the District Court, and that's how they've come to this Court. And we appreciate this opportunity to have these two matters heard together, because there is some overlap, but I think there's also some important distinctions here. And to get back to that point, I really want to be clear that the agency here is arguing through a March memo that it can make Endangered Species Act enhancement findings and Convention on International Trade in Endangered Species or CITES non-detriment findings through adjudication. And one of the distinctions in our case is we have a record that shows that despite their new title, these findings are replicas of the exact findings deemed to be ruled by this Court. They don't change from permit to permit, and under the agency's own regulatory requirements, these findings must contain the legislative conclusions that make them rule. So in sum, the Court has to afford a March memo that requires a contrary outcome to this Court's ruling in Zimbabwe 1, and it must be set aside. Counsel, is the March memo a final agency action? Absolutely, Your Honor. How is it legislated? As I read it, it seems to just change the procedure. I mean, the agency has discretion whether to act through legislative rule or through adjudication. And in the wake of Safari Club, haven't they just exercised the option to act through adjudication? And if that reading is correct, the March memo is not a final agency action. So respond to that, please. Yeah, you're absolutely correct that typically agencies do have wide discretion to choose between adjudication and rulemaking. But here, the agency's discretion is cabined in two key ways that actually remove that discretion. So first, we have the Zimbabwe 1 ruling, right, that found that all of these legislative factors, these conclusions, these factual differences— Excuse me a moment. Excuse me a moment. When you call it Zimbabwe 1, you're talking about the same case that the government refers to as Safari? Yes, Safari Club B-Zinky, yes. Okay, why don't we just call it Safari so we don't get confused? Okay, right. So in Safari, this court found that legal and factual conclusions were legislative factors in these findings that made them into rules. The agency's own regulations, so if you look at 50 CFR Part 1732, 1722, 50 CFR 2361, those are the requirements for the findings at issue here, the enhancement and non-detriment findings. Those regulations require the agency to make the conclusions that this court said turn its findings into regulations. So while an agency may normally have some discretion, in this instance, that discretion is cabined. And that's why the March memo is so significant. You have in that, even though it's a two-page document, the agency completely re-envisions how it's going to implement and make critical contributions. Are you taking the position that it was illegal ab initio, without regard to Safari 1, for the agency to proceed through informal adjudication? After Safari. No, no, no, put aside Safari. Is it your argument that the agency had to proceed in this area by informal rulemaking under 553? It could not use informal adjudication. Without regard to Safari 1. That was certainly the argument that the trophy hunting community has put forward. Is that your argument in this case? Is that your argument in this case? Absolutely. I got an allusion to that, but I didn't get a real argument on that. I didn't get the argument that the government had to proceed through 553, could not have proceeded through informal adjudication, even without regard to Safari 1. Well, and I want to draw an important distinction, which I think is going to be very helpful for the discussion here. And that is, the government has created a lot of confusion between its trophy importing permitting decisions, which have always been made through adjudication. Would you do me a favor and just answer my question? Is it your contention that the government was obliged in this area to proceed through 553 to make the decisions it did, rather than informal adjudication, without regard to Safari 1? Yes, absolutely. Enhancement and non-detriment findings are rules, and they have to proceed through informal rulemaking procedures. And that is exactly why... I don't get that argument in your brief, although I got an allusion to that in your statement of facts. I don't get that argument in your brief. Well, I think we have just clarified right now that that is, in fact, our argument. And that's exactly why the March memo is unlawful and needs to be set aside, right? It's the agency looking at what this court said... What authority do you have for the proposition that the agency would have had to ab initio proceed through informal rulemaking, rather than informal adjudication? Well, for all the reasons that this court said in Safari Club, right? No, no, no. Safari Club dealt with specific findings, which it thought, the court thought, was really appropriately done through 553 as a rule, to be done that way. I'm asking a question going back earlier, which is, are you implicitly making the argument, because you didn't make it explicitly, that this was required, notwithstanding Bell Aerospace and Chenery, to be done through rulemaking? Yes. We are absolutely saying that the agency must make enhancement findings and non-detriment findings through rulemaking. And that the agency's March memo, saying otherwise, is contrary to law. Your fellow appellant also tied this point to the 1997 Special 4D rule and its reference to periodic review and updating of findings, and said that that was done by rule, and that supports the notion that at least since 1997, these countrywide findings had to be made by rule. But you don't make that argument. Do you adhere to it or not? And do you think it's significant in support of the position that you're clarifying now? I think what's far more important is actually looking at what the agency does through these findings. And again, we have in the record, in our case, examples of what these findings look like. They're in the joint appendix from page 92 to 213. And they show that they operate as rules. And that's the most important thing for purposes of this court and for administrative law, right? What is the effect of these findings? And they are forward-looking. And I would point this court to page 25 of our reply brief, where we actually cite to a prior enhancement finding from Fish and Wildlife Service, where the agency said, if we just look at an individual hunt, an individual import, we will never find that enhances the survival of the species. You will threaten species. Killing one doesn't enhance its survival, right? The agency has to look at the overall conservation and management of the species in order to get to enhancement. Is that your script that's trying to get me lost? Yes, it is, counsel. As I read Safari Club, and help me understand if I'm wrong, as I read Safari Club, we said that the rules there, they were legislative rules because they applied to future permits for years going forward. But what the Fish and Wildlife Service is trying to do right now is make enhancement findings on a case-by-case basis. That's not a legislative rule. Are you saying that if they make an enhancement on a case-by-case basis, that that's a legislative rule? Absolutely, Your Honor. And I want to be clear. Some of these permit applications are for hunts that have yet to come, right? So those enhancement findings are still forward-looking. Some permit applications are for past hunts, and some are for forward-looking hunts. But really what the agency is doing… Help me understand. Aren't the enhancement findings that are being made now under the permit-by-permit application of a different nature than they were under Safari Club? Absolutely not. In fact, they're identical. And that's the whole point of our Notice of Supplemental Authority. And a large portion of the Joint Appendix, pages 92 to 213, show that these, quote-unquote, new case-by-case enhancement findings are identical to the countrywide findings. They just have a hunter's name added in a couple of places. It's still the same forward-looking legislative factors that led this Court to conclude that these findings are rules. Well, when you say they're forward-looking, they're with respect to a given transaction. Respectfully, Your Honors, they're not. They're about the overall management in the country. I know, but they are with respect to… The conservation of the species. They're with respect to a specific permit, right? They have a specific hunter's name on them, but nothing about… No, no, no. Aren't they a specific permit? They are specified for a hunter's permit application, yes. That's right. But there's nothing in that actual finding, though. Let me ask another question, which goes to the impact of SAFARI 1. Suppose the agency had taken the opinion from the D.C. Circuit in SAFARI 1 and said, and we'll go ahead and continue to operate under the findings that we used before and apply them across the board to countries. Would that have been legal? I think that those findings would have definitely been challenged by the Court. It's their rules. That would have inspired notice and comment rulemaking. Counsel, answer my question. Suppose they had done exactly that. They said, okay, we think the D.C. Circuit's wrong. We're going to go ahead and continue to use these across the board, countrywide findings. Your Honor, in essence, that's what the agency is doing. Wait a minute. Answer my hypothetical. Answer my hypothetical, please. I am answering your hypothetical because that's precisely what the agency is doing and what our record shows the agency is doing. You're not answering my hypothetical because the answer is, it would have been palpably illegal to do that. And that's by way of demonstrating that the findings were dead because they were de facto legislative rules that didn't go through 553. So they were dead. That's right. But it is only up to this Court to say that when an agency acts unlawfully, that its agency action must be set aside. If an agency determines that it needs to re-envision its agency actions because of a legal flaw, the APA is clear that to repeal a rule, the agency must go through rulemaking. And I think there's a difference about the situation here where the agency did what I guess it thought was a guidance. The Circuit said, no, actually, that's a rule. So you want to work with that. You have to go through notice and comment. And the question is, do we have any case where in that situation where they hadn't gone through notice and comment but should have, the thing that they then have on their books has to be dismantled by notice and comment rather than them saying, oh, gosh, we thought it was a guidance. Never mind. We'd rather do this case by case. So I guess I know this is a long question, but I guess it's another way of asking what you and Judge Silberman were discussing, which is if we disagree with you that this kind of determination because it's countrywide, because it relies on these broad general determinations about circumstances in a country, if we disagree with you that they always and necessarily have to be done by rule but on a clean slate might have been done through permit by permit, then the question is, do you still have a claim that the agency's decision to back off from what the circuit has told it is a rule must be done through notice and comment? Yes. And I think that the 28-day letter plaintiff submitted and the NRDC Wheeler case is very helpful here. This is an analogous situation where we had the D.C. Circuit issue a ruling. The agency took that ruling and instead of following what the court said, interpreted it, expanded it, and created a whole own unique scenario. Counsel, wait a minute. Counsel, wait a minute. Stop. Counsel, the problem with that is that in that case there were parts of the rule that were declared illegal but not all. And the agency, by throwing out the rule, threw out the good parts as well as the parts that were declared illegal. So the case is quite distinguishable. And in our situation here we have a remand from the D.C. Circuit to the service that says initiate rulemaking. And rather than doing that, the agency re-envisioned that ruling and decided to do something else. And that is exactly the circumstances that trigger the agency's obligation to engage in notice and comment. The agency's figuring out how do we respond. Do you read the SAFARI 1 as a command to the agency to engage in rulemaking as opposed, contrary to Bell, Aerospace, and Chenery? The last sentence of the SAFARI Club decision says that the case is being remanded to the district court with instructions to the service to initiate rulemaking. I would think that the more significant part of the remand is that it didn't vacate the rule, the countrywide finding. It didn't vacate that. So that's in effect. And then the question is what does the agency need to do to take it out of the status that the circuit gave it, which is it's a rule, and say we want to go back to the world that Judge Silverman is describing where we have a free and open choice of which way to proceed. And we want to do adjudication. We don't want to be in this terrain of rule. And the thing that I find novel is I'm not sure I've seen a case where something is sort of, you know, in some metaphysical sense a rule, but it hasn't been procedurally validated in a way that would make it operative as a rule, and that because of that character, the agency needs to dismantle it through notice and comment, even though it didn't build it through notice and comment. That's what feels different to me here. And I think that's right, and I think that those two layers, if we can call it that, of rulemaking obligations here are what makes this case so complex. But the answer on both of those fronts, if I could ask you briefly. Counsel, counsel, excuse me. I don't understand what benefit you expect to get from notice and comment. There's a tremendous amount of benefit from notice and comment, and one of the things that the March memo revealed is the agency had been relying on findings dating back to 1997 and 1995. The agency is figuring out, first of all, the system. How is it going to make findings under the ESA and CITES going forward? That's an important question that absolutely, for purposes of fairness and for informed decision-making, requires public involvement. But then, too, as the agency decides on the pending permit applications before it, the species, the country combinations, that's also a key point for public involvement. And, again, the agency was relying on findings that are dated back decades. So there's lots of opportunity for the public to be able to provide new information, for scientific information to come into play, for species status to come into play. We disagreed with your reading of Safari Club, that it was a direction to the agency to engage in rulemaking. Wouldn't it then be up to the agency to decide whether they want to go down the rulemaking path or down the adjudication path? And in that case, and in that instance, that's their call. That's their discretion. But that's their call and their discretion, though. That absolutely is a substantive rule, right, deciding how the agency is going to interpret the ESA and the CITES and these findings and make them going forward. I don't think that's the argument at all. The standard is still the same as to whether there's a – which type of enhancement is to be found. It's just where is that decision made and what sort of scope does it have? And I think the agency's argument – I probably won't make it well for them. They'll make it well for themselves. But the agency's argument is that there was nothing in Safari Club 1 that required them to act by legislative rule, that they could make individual determinations on a case-by-case basis of whether that particular permit application was a positive enhancement or a negative enhancement, and that there's nothing in Safari Club 1 that stripped them of that discretion. And your response to that is? My response to that is, if you look at the agency's regulations for making these findings – Okay, we're back to the regulations then. Okay. They require them to consider those very legislative factors that turn these findings into rules. And again, as we pointed out on page 25 of our reply brief, the agency said if it just – in making an enhancement finding, if it just looks at that one hunch, it can't get there. It can't make a positive finding. It has to look at those legislative factors in order to be able to make a positive enhancement finding. Okay. Okay. Okay. If there are no further questions from Judge Pillard and Judge Silberman, we will hear from Mr. Hernick. All right. Thank you. Thank you, Judge Griffith. May it please the Court, this is Stephen Hernick for Appellant Friends of Animals. I guess I'd like to start with the substance of the March Memo, which is the relevant agency action here. The March Memo is a terse three-paragraph memorandum that is absolutely final agency action. There's no indication in the March Memo that it is an interim procedure and it has a big effect on rights. It withdraws more than a dozen countrywide enhancement findings, not just the two enhancement findings, which Safari Club determined were legislative rules. Wait a minute. Stop for a second there. Isn't the implication and the necessary implication of Safari Club that all of those findings suffer from the same APA defect? Well, Judge Silberman, that wasn't quite the holding in Safari Club. Safari Club held that any enhancement findings like these are legislative rules and need to go through notice and comment rulemaking. But there was not a holding in Safari Club that all of these other enhancements… Wait a minute. There wasn't specificity to that, but wasn't it the necessary implication? It's simply not in the record whether these other legislative rules went through rulemaking or not. I'm not sure why that would… Oh, go ahead. Go ahead. No, no. Go ahead, Judge Pillard. I was just going to say I'm not sure that's where the action is for your claim because you have to take the position that… All right. At least I've understood you've been taking the position that once the court has held this is a legislative rule, whichever we're talking about, the 2017 or the prior ones, then can it be treated as something other than a legislative rule for purposes going forward? And Judge Silberman's articulating another version, which is these are just invalid, so clean slate. And I guess the question is which is it and why? Is it that the service is suddenly holding a lot of legislative rules that it needs to start from there and figure out whether it's going to dismantle them or build the foundation that they need to be used going forward? Or is it they've got nothing, and therefore they can choose ab initio, tenere, adjudication, or rulemaking? Because your briefing treats them as if they are rules, but there's like a step missing there because they were promulgated as rules. Thank you for the question, Judge Pillard. Our position is that they're legislative rules. The holding in Safari Club International is that these enhancement findings were legislative rules. If the court in Safari Club International had thought that these rules were simply invalid, it would have vacated them, but the court did not vacate them. No, because the court obviously was under the impression that the agency could cure the illegal defect by going through notice and comment. So that was not surprising that it didn't vacate. But the fact of the matter was these rules were illegal. Isn't that correct? Well, they weren't properly promulgated. Answer my question. Were they not illegal? They were illegal in the way that they were promulgated. Then they're illegal. They're illegal. There's no question about it. If the agency, which goes back to my initial question of your co-counsel here, if the agency had tried to implement them after the court had decided, it would have been subject to condemn. I absolutely agree with that, Judge Silberman. So they were illegal rules. When you talk about them as rules, you should refer to them as illegal rules. And then to follow on, if they were illegal rules, why would you have to have notice and comment to withdraw them? That's what I feel. I mean, Judge Griffith, a lot went into the development of these rules. I mean, these were more than a dozen enhancement findings that covered a wide variety of countries and species and years. There was a lot of input from a number of interested parties. And they're all illegal. They're all illegal. Why do you have to have notice and comment to withdraw them? Well, that is what the APA requires, Judge Griffith, in order to withdraw rules. Well, even if you look at the Consumer Energy Council from this circuit, even if you have a case where an agency believes that its rules are defective, that its rules are illegal. That's very different than a court finding that they're defective. What you have in Consumer Energy is just an agency making a decision about it. I think that's very different than what we have here in Safari Club. I wouldn't disagree with that, Your Honor. But nevertheless, the holding in Consumer Energy Council is saying that even if rules are defective, that still doesn't explain why an agency can't go through the process of notice and comment rulemaking. In that case, you were trying to prevent misbehavior, chicanery by an agency. That's not what's going on here at all. I think they're very different cases. The APA, under its terms, exempts an agency from going through notice and comment rulemaking if the agency, for good cause, finds that notice and comment rulemaking would be unnecessary. But here, there was no finding of good cause. Arguably, the Safari Club panel found that. They said they were illegal. So if the agency's question before it is, should we withdraw the rules? Well, after Safari Club won, the only answer you can give is, yeah, we have to withdraw them. Under that scenario, I just don't see the value of notice and comment. Well, notice and comment, Your Honor, would be valuable for the substance of the rules. The court in Safari Club did not hold that the actual rules themselves were arbitrary and capricious, simply that they were improperly promulgated. If you're saying that what's needed is notice and comment before the substance is applied through adjudication as opposed to rulemaking, isn't the thing you have to make it—the value that you have to show is that the formal shift from a countrywide finding to permit-specific findings is something on which there's an entitlement to notice and comment, or am I missing something? Yeah, and that's a separate argument, Judge Pillard. I mean, on the one hand, we argue that the withdrawal of these rules requires notice and comment. But in addition to that, the substantive change in policy that the service is announcing in the March memo, this switch from its decades-long policy of issuing these enhancement findings on a countrywide basis, they're now switching to these case-by-case— Why is that? First of all, I didn't take either one of you to make the argument that was suggested by your co-counsel that this policy must be articulated through rulemaking as opposed to informal adjudication. Are you making that argument that as a matter of law, notwithstanding Bell Aerospace and Chenery, that the agency had to proceed through rulemaking? Certainly not under the language of the APA itself, Judge Silberman, but if you look to the special rule for elephant 50 CFR section 17.40 E6, it says in there that the service needs to make a determination that the killing of this trophy animal will enhance. The survival of the species. That is a prospective determination that use of the language will enhance is important. The service is not allowed to make these backward-looking determinations that, okay, yes, this applicant who killed this elephant in Zimbabwe six months ago, that enhanced the survival of the species. That is directly contrary to the language of the special rule. When does the permit issue? When does the service issue the permit, Your Honor? When does the permit issue? Well, it varies from case to case, and I'd suggest that may be a better question for the government attorney. But I think under this regime, in some cases it could be before an animal was killed, but in other cases it will be after an animal was killed. And I think to get back to Judge Pillard's question, I thought the argument was presented in one of your briefs that a party wouldn't go hunting unless it had a permit to bring an animal back. I thought that was in one of your two briefs. Well, Judge Silberman, I would certainly agree that a hunter is not going to pay $100,000 to go kill an elephant in Zimbabwe unless that hunter believes that he can import the... Unless he's got a permit. Well, not necessarily, Judge Silberman. I think unless he believes that he can import that animal back to the United States, under the previous policy of the service where they had a countrywide ban for Zimbabwe issued in 2014 and 2015, I would certainly agree with you that no hunter is going to go kill an elephant in Zimbabwe knowing that he cannot import the remains of that animal back into the United States. But I think under the current regime, there's uncertainty. And that is not necessarily going to deter a hunter from going to Zimbabwe to kill an elephant. Let me ask you the question I asked your counsel. Is it your position that as a matter of law, even if Safari 1 had never been decided, that the government had to proceed through rulemaking under 553 as opposed to informal adjudication? Yes, Your Honor.  Well, no, we do make that argument, Your Honor, under the language of the ESA and the language of the Elephant Special Rule. Under the ESA, the service is only allowed to regulate and conserve threatened species through regulations. It's issued a regulation in this case, the Elephant Special Rule. But the agency does issue regulations. There's no question about that. Right, right, no, and we're not contesting that. But the regulation that it's issued in this case, the Elephant Special Rule, by its terms says a determination needs to be made that the killing, quote, will enhance the survival of the species. And so proceeding in this manner now is contrary to that language in the Special Rule. And if we don't accept that ground, you mentioned another ground for saying that this has to be, by its nature, has to be done by regulation, and that is? Yes, Judge Bellerin, you had kind of touched on this earlier. The March Memo itself is effecting this big substantive change in the service's longstanding policy of issuing enhancement findings. And that policy change itself needs to be done through notice and comment rulemaking. But it has big effects on a number of parties. Interested parties are no longer able to participate in the rulemaking process, no longer have notice of when the service is making these enhancement findings, and the service is no longer obligated to consider information that third parties submit. So under this current regime established by the March Memo, the service is only going to be looking at information submitted by the trophy hunters. And there's no effective way for other interested parties to counter that. Okay. I'll let my colleagues have further questions for you, Mr. Hoernig. We will ask Mr. Ingalls to address this now. Thank you, Your Honor. Good morning, and may it please the Court. I'm Summer Ingalls for the federal employees, and we ask the Court to affirm dismissal of both complaints. Before I turn to the merits, I'd like to speak very briefly about what the Fish and Wildlife Service's plan switch to making enhancement findings on a permit-by-permit basis will and will not change. Yes, it's true that the service is no longer planning to make binding prospective determinations on a countrywide level about whether hunting in a particular area will or will not enhance the survival of threatened species. And instead, they'll be making those decisions on a permit-by-permit basis. But the standards applicable to that analysis won't change. The permits will be no more or less available to the public than they were before. And the March Memo makes clear that the Fish and Wildlife Service is open to receipt of information from all interested parties, including the parties before this Court, and that it will consider that information when it makes these enhancement findings. Ms. Engalls, let's imagine that Judge Pillard made an application to go elephant hunting in Zimbabwe. And as part of her application, the Fish and Wildlife Service gave a positive enhancement finding. And so she's got her permit, and she's ready to go. Three months later, I come along and apply to have a permit to go elephant hunting in Zimbabwe. Is the Fish and Wildlife Service going to undertake a separate investigation to determine positive or negative enhancement, or are they just going to rely on what they've already done in Judge Pillard's permit application? It's a separate determination each time, because the agency is going to... Is that really how it works on the ground? Because it sure looks like there's a lot of cutting and pasting going on here. Well, it makes sense that a lot of the countrywide information might not change in a three-month period. But when the service makes these determinations, it's looking not only at information from the country, it's looking at information in the permit applications it receives, which could include information about where the hunting organization that sort of sponsored this hunt, the level of quota in each country, where they are, and the number of hunts that have occurred that year. And so the service is required to look at each application individually. And although it's true that applications that look exactly the same might get the same results, there's nothing that says that the permit adjudication is improper simply because the agency reached the same result each time. Looking at the validity of each of those permit determinations would require looking at the information that was before the service. Okay. Could you address your friend's argument about the significance of the March memo? They argue that it's a final agency action that changed substantive law. What is your response to that? It is not a final agency action. It did not change substantive law. It only explained that the service is planning to make these findings using the same standards, but on a permit-by-permit basis. Has the service ever made these on a permit-by-permit basis? Well, it seems in the whole history of this program, whenever there were endangerment findings or non-endangerment findings, they were made countrywide. For this particular type of permit, that import permit for trophy hunting, for threatened species, to my knowledge the service has always had countrywide findings on file, and those were the sorts of findings before the court in Safari Club. But the service makes these enhancement determinations for all sorts of permit adjudications for, for example, use of biomedical information, importing pets, information or permits sought by museums and zoos, and those determinations are all made on a permit-by-permit basis. But are there, yeah, I mean, the plaintiffs here are saying this is a kind, I mean, unlike, you know, whether your pet is safely vaccinated or what your planned use is of biomedical information, here there is a chunk of what's required in the permit that by its nature is something that, A, the permit holder really doesn't have much information about. It's the government that does government-to-government and, you know, goes and figures out what the system is like on the ground in Zimbabwe and inquires into corruption and inquires into what programs these tour and hunting groups are, you know, contributing to. So it's just hard to envision how that really could be done on a permit-by-permit basis in any meaningful sense. I think that, well, the permit-by-permit basis, I think the primary benefit here is that the service is looking only at the application before it. And so as a result, it remains a lot more nimble to respond to information it receives from interested parties and also in the course of those government-to-government discussions. And when it receives information indicating that a country isn't managing its hunting program properly or there's been a change in the population in a country where a hunt is expected to occur, the agency is able to respond much more quickly. So how does the opponents of trophy hunting get their information or their position before the agency? There are a variety of different ways. It's true that the notice and comment process is not one that the service plans to follow at this point because it's not making rules. But the Fish and Wildlife Service's website includes the phone numbers and email addresses of the people responsible for making these sorts of determinations for all of those offices. And the truth is that these organizations regularly participate and provide information to the Fish and Wildlife Service, and that's clear in their pleadings. And they'll be no less able to do that now than they were before. And suppose they disagree with the agency's granting of a permit. They could sue, could they not, and claim that's illegal under the statute? That's true. They could sue and challenge issuance of the permit or the enhancement findings. The standards applicable to the services analysis are set forth clearly in the services regulations. 50 CFR 17.32 and in the special rules for threatened species at 17.40. And so it's clear what the service is going to be considering and evaluating when it makes these determinations. And the service wants to get it right. So it's eager to receive information from parties both interested in promoting hunting and also parties who are interested in opposing it. But ultimately the service is changing. I'm sorry, how would you respond, Ms. Engels, to a characterization of the planned approach going forward that there is still a countrywide determination, same as there was before, same information. And I know that's not formally what the March memo said, but that's, you know, what the plaintiffs are charging here. You're still using the countrywide determination. It's just been demoted a little bit to a rebuttable presumption. And any permit holder who comes in and wants to either enhance or, you know, if those staff members hear from the plaintiffs here, they might demote the presumption. But isn't it the case that the information, not just information that might apply differently to different permits, but in effect kind of a general rule that the enhancement has been found? The withdrawn findings no longer have a conclusive effect. It's true that for the 2017 findings for lions and elephants, the service has issued permits for lions that look quite similar to the withdrawn findings. And that makes sense because the service, that information remains live. The information about the status of hunting programs in countries like Zimbabwe are not affected by the fact that the service is no longer proceeding by rulemaking. And so, yes, the information is the same. The service has made clear that it intends to rely on the information. But if it receives different information or information from interested parties indicating that the information it has before it is incorrect, the March Memo says that the service will consider that information and take it into effect or into consideration. And so that's the primary thing. That's just a general question that I think came up in our questioning of Mr. Hermick. The timing of how these programs work is a little bit unclear to me. So this whole case is not moot, even though we're talking about 2017, partly because the 2017 rule didn't have a definite end date. But then there's also this 2015 rule. Are there trophies that people killed in 2015 that are in some warehouse somewhere? It's not just prospective application. Can you explain that to us? Sure. Just factually, the way this works, people sometimes seek permits before they have gone out to hunt trophies because they want some advance assurance that they're going to have the ability to import these trophies. But a number of people also might hunt the trophies and then keep them in storage in the country where they were hunted and then seek permits to bring those trophies back. But the fact that the service might be issuing permits or making determinations for hunts that might occur in the future doesn't make the determinations a rulemaking, where they're made in the course of one permit and apply only to one permit. Of course, the APA makes clear that an adjudication is a process for coming to an order, which includes issuance of a permit. And when that permit applies prospectively, that doesn't transform the analysis into a rulemaking. Any more than a license would. That's correct. I'm a little confused about how the endangerment findings are even relevant in the context of retrospective permitting because, and this is picking up from something the district judge said, that those animals are dead one way or the other. So an assessment whether that death contributed to endangerment or not is a little metaphysical. Do you help with that? It's difficult. I think it has in part to do with the fact that the Fish and Wildlife Service is doing its best to manage activities that occur abroad in an area where it has no control over whether hunting occurs or not. Yes, this is an important point, Counsel. Our government doesn't regulate hunting in Zimbabwe. We only regulate the return of the trophy. That's correct. And so the service requires an enhancement determination even for hunting that has already occurred because that's simply the best it can do to have a role in regulating and assessing activities that occur abroad. And I think the hope is that it will encourage people to seek these permits in advance where the service's enhancement finding might have more of an effect and also, if appropriate, provide advance assurance that the hunter can bring home the trophy or make clear that they will not be able to bring home the trophy and prompt them to consider whether to proceed with the hunt in the first place. The agency's determination to switch to adjudication is not only not a final agency action but not a legislative rule. Here, the agency was simply exercising its discretion to use adjudication rather than notice and comment rulemaking, where the court in Safari Club v. Zinke had made clear that if it wanted to proceed by notice and comment rulemaking, it would have to undertake that lengthy process. The Supreme Court made clear in Chenery that agencies have the discretion to choose one approach over another where it decides that one approach would be a better way to carry out statutory mandates. And here, the fact that this decision to switch to adjudication results in a change in the manner in which interested parties engage with the agency doesn't make it a legislative rule that triggers notice and comment rulemaking. Great. Do my colleagues have any further questions for Ms. Engels? No. No, thank you. Great. Thank you very much, Ms. Engels. Thank you very much. We'll give back a minute each on rebuttal to Ms. Sanner and Mr. Hernick. Thank you, Your Honor. I would like to briefly touch on the forward-looking impact of the March memo. We've talked a lot about its backward-looking portion. And as our friends, to borrow your phrase, Judge Griffiths, acknowledged they're no longer going to make countrywide-level findings. So the March memo took import bans off the table. And as we saw in the Safari Club case, that's an important conservation tool. It was so important that even after finding that the import bans were unlawfully established, this court kept them in place. And so I think it's important, if you look at the March memo and what its effects are, that's a significant substantive impact on how the agency is implementing its obligations under the ESA and under CITES. And it's exactly the type of decision-making that requires notice and comment rulemaking. You would certainly have an argument, possibly, if you were challenging an individual permit, you could raise a challenge to that informal adjudication on the grounds that the agency had to engage in rulemaking. Now, I think you would have a hell of a problem because of Chenery and Bell Aerospace. But you could make that challenge. But as Judge Griffith's point implies, the March memo doesn't do anything. It says what the agency needs to do, but it hasn't done it yet. And when it sees with an informal adjudication, you certainly have the right to argue that that must be done by rulemaking. May I answer your honor? I'm out of time. Thank you. I have to respectfully disagree on two counts. The first one is I think it would be very difficult for non-hunters to go into court on an individual enhancement finding and actually have standing to be able to bring their case. Sure, you'd have standing if you were against hunting altogether and you had individuals who went to Zambia and looked for lions and elephants under Lujan versus wildlife, you'd have standing. Excellent. And the second point is, though, that the March memo does have this substantive impact by saying we're taking this conservation tool of an import ban off the table. We're not going to use it anymore. And in Zimbabwe, in the Safari Club case, we saw poaching, elephant deaths outpacing births, and the government putting in place a countrywide ban on trophy imports signaling to hunters we don't think we should be contributing to elephant deaths in this country right now. That conservation tool is gone. Do my colleagues have any further questions for Ms. Satterthwaite? No. Okay. Thank you, Ms. Satterthwaite. We have your argument. Mr. Herlich? Thank you. Thank you, Your Honor. The March memo does have a real substantive effect going forward. As Ms. Satterthwaite argued, no longer will the service issue countrywide bans. The service has made that clear in the March memo. That is an open invitation to trophy hunters that they can go and not worry that there will be an outright ban on importing these animals into the U.S. I mean, I think another effect of the March memo is that by withdrawing these former rules, now there's a situation where the service could grant a permit from the killing of an elephant in 2015 in Zimbabwe when the service had already determined that that would not enhance the survival of the species and allow the import of that trophy that's since been sitting in a warehouse since 2015. I mean, to touch on the litigation point, I think a big intent of the March memo was to insulate these findings from litigation. I have a hard time believing that in the future, if we challenge these enhancement findings, that the government will not argue that we lack standing because we're only challenging the killing of one animal, and that simply does not have an effect and is not established standing. Thank you. Do my colleagues have questions for Mr. Hoernig? No. Great. Thank you very much. And again, to all the council, thank you for your patience as we deal with this unusual circumstance. The case is submitted. And to my colleagues, if you will hang up, I will call you within the next five minutes or so, and we'll have our conference amongst the three of us. But the case is submitted. Thank you.
judges: Griffith, Pillard, Silberman